REDACTED VERSION

**GUTRIDE SAFIER LLP**
SETH A. SAFIER (State Bar No. 197427)
MARIE A. MCCRARY (State Bar No. 262670)
HAYLEY REYNOLDS (State Bar No. 306427)
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

MATTHEW T. MCCRARY (admitted pro hac vice)
4450 Arapahoe Ave., Suite 100
Boulder, CO 80303
Telephone: (415) 639-9090
Facsimile: (415) 449-6469
www.gutridesafier.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SHERRIS MINOR as an individual, on behalf of herself, the general public and those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BAKER MILLS, INC.; and KODIAK CAKES, LLC,<br><br>Defendants. | CASE NO. 20-cv-02901-RS<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>DATE:  November 4, 2021<br>TIME: 1:30 p.m.<br>CTRM: 3<br><br>HONORABLE JUDGE SEEBORG |

**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**

Please take notice that on November 4, 2021, at 1:30 p.m., or soon thereafter as this motion may be heard, Plaintiff Sherris Minor will, and hereby does, move, pursuant to Rule 23 of the Federal Rules of Civil Procedure, to certify the following class:

> All persons in the State of California who purchased the Products[1] between April 9, 2016 and the present.

The Class will pursue claims under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL"), the California Legal Remedies Act, Cal. Civ. Code §§eq., ("CLRA"); the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 et seq. ("FAL"); and for common law fraud, deceit and/or misrepresentation.

Plaintiff further requests that the Court (1) Plaintiff Sherris Minor as class representative on all claims, and (2) Gutride Safier LLP as lead counsel.  Plaintiff finally requests the Court to order the parties to meet and confer and present this Court, within fifteen (15) days of an order granting class certification, a proposed notice to the certified class.

This motion is based upon this Notice of Motion and Motion, Memorandum of Points and Authorities, and the accompanying Declarations in support of Class Certification by the following persons:

- Hayley Reynolds
- Dr. Michael Dennis
- Colin Weir
- Dr. Robert Wolfe
- Stephen Gaskin
- Seth Safier
- Sherris Minor

(In the Memorandum of Points and Authorities that follows, these declarations shall be referred to by the last name of the declarant, followed with the abbreviation "Decl." (For example: "Reynolds Decl.")  This Motion is also based on the pleadings and papers on file in this action and all matters of which this Court may take notice.

---

[1] The Products are all Kodiak Cakes products that made a representation regarding the grams of protein per serving on the principal display panel of the product labels during the Class Period.  A non-exhaustive list is attached as Exhibit B to the First Amended Complaint filed January 4, 2021.

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................1

II.   STATEMENT OF FACTS ........................................................................2

      A.    Kodiak Cakes Makes High Protein a Pillar of Its Brand Because
            Consumers Desire Higher Protein Products........................................2

      B.    Kodiak' Protein Claims Are Both False and Misleading: The Products
            Neither Contain nor Provide as Much Protein as Advertised. ...........4

            1.    Regulatory Framework.........................................................5

            2.    Protein Quality Is Critical for Determining the Amount of Protein
                  the Human Body Can Nutritionally Utilize as Protein ....................7

            3.    Kodiak Cakes' Products Use Low Quality Proteins like Wheat and
                  Oats that Provide less Protein than Claimed. ....................................9

            4.    Kodiak Overstated Protein Quantity by Using an Inflated Nitrogen
                  Factor.................................................................................10

      C.    Kodiak Consistently Misrepresented Protein During the Class Period ......11

      D.    Kodiak' False and Misleading Representations Deceived Consumers.......12

      E.    Kodiak Was Able to Charge a Price Premium as a Result of its False and
            Misleading Labeling..............................................................................13

III.  ARGUMENT ..........................................................................................14

      A.    The Class Satisfies the Requirements of Rule 23(a)..................................14

            1.    The Class is Sufficiently Numerous................................................14

            2.    There are Common Questions of Fact and Law.............................14

            3.    Plaintiff Is Typical of the Class.....................................................17

            4.    Plaintiff and Counsel Will Adequately Protect the Interests of the
                  Class ................................................................................................18

      B.    The Class Satisfies the Requirements of Rule 23(b)(3) .............................18

            1.    Common Questions Predominate About Whether Kodiak's Front
                  Label Protein Representations Were False or Misleading. .............19

            2.    Common Questions Predominate on Unlawfulness........................20

Pl.'s Motion for Class Certification

3.      Common Questions Predominate on Restitution and Damages. ....20

4.      Common Questions Predominate on Materiality ............................23

5.      A Class Action is Superior. ..............................................................24

IV.      CONCLUSION ........................................................................................................25

Pl.'s Motion for Class Certification

1

## TABLE OF AUTHORITIES

2

<u>**Cases**</u>

3

*Allen v. Hyland's Inc.*, 300 F.R.D. 643 (C.D. Cal. 2014) ............................................. 29

4

*Ang v. Bimbo Bakeries USA, Inc.*, 2014 WL 1024182 (N.D. Cal. Mar. 13, 2014) .................... 23

5

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) ...................................................... 14

6

*Astiana v. Kashi Co.*, 291 F.R.D. 493 (S.D. Cal. 2013) ........................................ 16, 19, 20, 21

7

*Bailey v. Rite Aid Corp.*, No. 4:18-cv-06926 YGR, 2021 U.S. Dist. LEXIS 81654
    (N.D. Cal. Apr. 28, 2021) ..................................................................... 25, 27

8

9

*Briseno v. ConAgra Foods, Inc.*, 674 F. App'x 654 (9th Cir. 2017) ................................... 26

10

*Brown v. Hain Celestial Grp., Inc.*, 2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) ........... 24, 29

11

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) *cert. denied*, 13-430,
    2014 WL 684064 (U.S. Feb. 24, 2014) ..................................................... 27

12

13

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004) .................................... 30

14

*Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365 (N.D. Cal. 2010) ....................... 17

15

*Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App. 4th 663 (2006) ............................. 24

16

*Comcast v. Behrend*, 133 S. Ct. 1426 (2013) ................................................... 24, 25

17

*Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163 (2000) .......................... 24

18

*Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, 326 F.R.D. 592 (N.D. Cal.
    2018) ................................................................................... 22

19

20

*Guido v. L'Oreal, USA, Inc.*, 2013 WL 3353857 (C.D. Cal. July 1, 2013) ............................ 25

21

*Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084 (N.D. Cal. 2018) ............................ passim

22

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ..................................... 14, 19

23

*In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919 (C.D. Cal. 2015) ................................... 26

24

*In re High-Tech Employee Antitrust Litig., 985* F. Supp. 2d 1167 (N.D. Cal. Oct.
    24, 2013) ............................................................................... 27

25

26

*In re POM Wonderful LLC Marketing & Sales Practices Litig.*, 2012 WL 4490860
    (C.D. Cal. Sept. 28, 2012) ................................................................ 17

27

28

*In re Tobacco II Cases*, 46 Cal. 4th 298 (2009) .................................................. 22

*In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 722 F.3d 838 (6th Cir. 2013) *cert. denied,* 13-431, 2014 WL 684065 (U.S. Feb. 24, 2014)......................27

*In re: Lenovo Adware Litig.*, No. 15-MD-02624-RMW, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ...............................................................................................26

*Just Film, Inc. v. Buono*, 847 F.3d 1108 (9th Cir. 2017) ........................................18, 19

*Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal. 4th 1134 (2003) ........................24

*Korolshteyn v. Costco Wholesale Corp.*, No. 3:15-CV-709-CAB-RBB, 2017 WL 1020391 (S.D. Cal. Mar. 16, 2017).......................................................................16, 21

*Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552 (N.D. Cal. 2020)..................17, 22, 26

*Kumar v. Salov N. Am. Corp.*, No. 14-CV-2411- YGR, 2016 U.S. Dist. LEXIS 92374 (N.D. Cal. July 15, 2016) .................................................16, 22, 28, 29

*Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011) .............................................29

*Lilly v. Jamba Juice Co.*, 308 F.R.D. 231 (N.D. Cal. 2014) .........................................23

*Mazza v. Honda American Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) .............16, 21

*McCrary v. Elations Co., LLC*, No. EDCV 13-00242 JGB OP, 2014 WL 1779243 (C.D. Cal. Jan. 13, 2014)........................................................................21, 24

*McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017) ........................................................27

*Mullins v. Premier Nutrition Corp.*, No. 13-CV-01271-RS, 2016 WL 1535057 (N.D. Cal. Apr. 15, 2016)...................................................................................22

*Occidental Land, Inc. v. Superior Court*, 18 Cal. 3d 355 (1976)................................28

*Pettit v. Procter & Gamble Co.*, No. 15-CV-02150-RS, 2017 WL 3310692 (N.D. Cal. Aug. 3, 2017) ...................................................................................passim

*POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014) .....................................5

*Reid v. Johnson & Johnson*, 780 F.3d 952 (9th Cir. 2015).............................................6

*Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523 (N.D. Cal. 2012) ............................16, 22

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003)......................................................20

*Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011)...............................21, 28

*Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150 (9th Cir. 2016) ..................18

*Vasquez v. Superior Court*, 4 Cal. 3d 800 (1971) .......................................................18

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........................................... 15, 27

*Wang v. Massey Chevrolet*, 97 Cal.App.4th 856 (2002) ........................................ 23

*Werdebaugh v. Blue Diamond Growers*, No. 12-CV-2724-LHK, 2014 U.S. Dist. LEXIS 71575 (N.D. Cal. May 23, 2014) ................................................................ 20

*Williams v. Gerber Products Co.*, 553 F.3d 934 (9th Cir. 2008) .............................. 16

*Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010) ............... 19

*Zeiger v. WellPet LLC*, No. 3:17-cv-04056-WHO, 2021 U.S. Dist. LEXIS 37815 (N.D. Cal. Feb. 26, 2021) ......................................................................................... 25

**Statutes**

21 C.F.R. § 101.13 ........................................................................................................ 16

21 C.F.R. § 101.13(b) ..................................................................................................... 5

21 C.F.R. § 101.13(c) ................................................................................................... 5, 6

21 C.F.R. § 101.13(i) ..................................................................................................... 20

21 C.F.R. § 101.13(i)(3) ................................................................................................. 1

21 C.F.R. § 101.9 ............................................................................................................ 5

21 C.F.R. § 101.9(c)(7) ................................................................................................... 6

21 C.F.R. 101.13(b)(1) ................................................................................................... 5

21 U.S.C. § 343 ........................................................................................................ 16, 20

21 U.S.C. § 343(a) .......................................................................................................... 5

C.F.R. § 101.9(c)(7)(ii) ................................................................................................... 9

Cal. Bus. & Prof.Code §§ 17203 ................................................................................... 21

Cal. Bus. & Prof.Code §§ 17535 ................................................................................... 21

Cal. Civ. Code § 1761 .................................................................................................... 21

Cal. Civ. Code § 1780 .................................................................................................... 21

Cal. Civ. Code § 3294(a) ................................................................................................ 21

**Other Authorities**

https://www.inc.com/emily-canal/kodiak-cakes-shark-tank.html ................................. 2

-3-

**Rules**

Fed. R. Civ. P. 23(a) (1) ...................................................................................... 14, 15

Fed. R. Civ. P. 23(a)(4) .......................................................................................... 20

Fed. R. Civ. P. 23(b)(3) .......................................................................................... 21

**Regulations**

56 Fed. Reg. 60366, § B............................................................................................ 8

Pl.'s Motion for Class Certification

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

Baker Mills, Inc., and Kodiak Cakes LLC (collectively "Kodiak" or "Defendants") went from the brink of insolvency to wild success thanks to one key attribute: protein. Since 2014, Americans have grown increasingly health conscious, seeking high protein products to refuel after a workout or simply to eat better. Kodiak cashed in on that desire. It was an "early mover" on adding protein claims to pancake mix and then expanded its protein product line to frozen waffles, oatmeal, muffin mix, and beyond. Despite touting its "high-quality protein" and "essential protein you need to conquer your frontier," Kodiak rose to its top spot in the category by selling a lie: the majority of protein in Kodiak's products comes from low-quality, incomplete sources that the human body cannot use as protein. Indeed, upon correcting for protein quality using the FDA's mandated measure—the Protein Digestibility Corrected Amino Acid Score ("PDCAAS")—Kodiak's products provide ██████████ the protein they claim.

Kodiak's conduct violates FDA regulations (and California law) that prohibit a label from being "false or misleading in any respect." 21 C.F.R. § 101.13(i)(3). Indeed, the FDA has stated that it requires PDCAAS testing *precisely* so that consumers can "readily identify foods with particularly low quality protein to prevent them from being *misled* by information on only the amount of protein present." 58 Fed. Reg. 2079, 2102 (emphasis added). Kodiak's labels deceive consumers in exactly this manner. Over 90% of surveyed consumers had *no idea* that Kodiak's products did not provide the amount of protein claimed on the front label in a form their bodies could use as protein, let alone that the products provided ██████████

Kodiak compounds its front label deception by violating FDA regulations on reporting protein in the nutrition facts panel on the back of the box. Under 21 C.F.R. § 101.9(c)(7), protein in the nutrition facts "may be calculated on the basis of the factor of 6.25 times the nitrogen content of the food. . . . *except* when official AOAC procedures described in this paragraph (c)(7) require a specific factor other than 6.25, *that specific factor shall be used*." AOAC procedures for wheat protein—the primary protein source in Kodiak's products—require a conversion factor of 5.7. ██████████████████████ that allowed it to claim, for example, 14

grams of protein in the nutrition facts panel for its flagship pancake mix when it should have been only ███████ Also, FDA regulations required Kodiak to use PDCAAS to provide "[a] statement of the corrected amount of protein per serving . . . calculated as a percentage of the RDI or DRV for protein, as appropriate, and expressed as a Percent of Daily Value" in the nutrition facts panel. 21 C.F.R. § 101.9(c)(7)(i)-(ii). Kodiak has admitted, unequivocally, that it never did so on any of its products at any point in the class period.

Given the nature of this case, it is a textbook example for class certification. Whether Kodiak's conduct unlawfully violated FDA regulations is a necessarily common question. Whether Kodiak's front label protein representations were materially misleading is another necessarily common question based on an objective "reasonable consumer" standard. Whether the products actually provided the amount of protein they claimed is also a common question susceptible to common proof. Throughout the class period the relevant labels stayed the same in all respects that matter: they all touted protein content with a grams of protein per serving claim that failed to account for the true amount of protein they actually provide. The product formulas also stayed the same throughout the class period in all respects that matter: all derived their protein from low quality, incomplete sources. The class's injury is likewise susceptible to class-wide proof in the form of Plaintiff's proposed conjoint price premium model that shows Kodiak's misrepresentations led to a market premium of at least 15.5%. These are the main issues in the case and thus, predominate over any individualized issues Kodiak may conjure up.

## II.   STATEMENT OF FACTS

### A.   Kodiak Cakes Makes High Protein a Pillar of Its Brand Because Consumers Desire Higher Protein Products

Kodiak began selling pancake mix in 1995. Its original selling points were whole grains and healthy ingredients, but it struggled to find success. Indeed, for over two decades, Kodiak teetered on the edge of financial ruin, relying on bailouts from the founder's father. Reynolds Decl., Ex. 3; Emily Canal, *This Startup Didn't get a Deal on "Shark Tank," and That Helped Save it from Bankruptcy*, INC., April 3, 2018, available at https://www.inc.com/emily-canal/kodiak-cakes-shark-tank.html. Kodiak needed innovation, so in 2014 it added protein claims to its original product, giving birth to what it called "Power Cakes." Kodiak differentiated

REDACTED VERSION

1  Power Cakes from other pancake mixes by touting on the front label that Power Cakes provided

2  "14g Protein per Serving." Reynolds Decl., Exs. 40, 41. They were an instant hit, and became a

3  ████████ for Kodiak throughout the class period. Weir Decl. at Table 1. Indeed, the Power Cakes

4  line allowed Kodiak ████████████████████████████████████████████████████████

5  ████████████████████████████████████ Reynolds Decl., Exs. 4, 5.

6  ████████ Given this wild success, Kodiak determined that it needed to ████████████ and

7  ████████████████ Reynolds Decl., Ex. █████

8  ██████████████████████████████████████████████████████████████

9  ██████████████████████████████ Reynolds Decl., Ex.7. As a result, Kodiak wasted no

10  time in expanding to other food products. It added claims of protein to muffin mixes, oatmeal,

11  frozen waffles, frozen flapjacks, all-purpose flour, "protein balls," and graham crackers,

12  ████████████████████████████████████████████████████████ *Id.* It

13  also created a new line of protein "cup" products—microwaveable single-serving products,

14  including muffin cups, flapjack cups, and oatmeal cups. Reynolds Decl., Exs. 8, 40.

15      On all of these products, and throughout the class period, Kodiak included a prominent

16  call-out on the principal display panel (next to the product name) touting the grams of protein per

17  serving the products provided (the "protein representation"). Reynolds Decl., Ex. 42 (Response to

18  Interrogatory No. 4). Indeed, although Kodiak redesigned some of its Product labels during the

19  class period, it only ever enhanced the visibility of the protein representations, such as by making

20  the ████████████████████████ Reynolds Decl., Exs. 9, 10. This was true regardless

21  of product category. *See* Reynolds Decl., Ex. 11 ██████████████████████████

22  ██████████████████████████ Ex. 12 ████████████████████████████

23  ██████████████████████████████████ Ex. 13

24  ████████████████████████████████████ Ex. 14

25  ████████████████████████████████████████

26  ████████████████████████████████████

27  ██████ Ex. 15 ████████████████████████████████████████

28  ████████████████████████████████



Pl.'s Motion for Class Certification



1        Kodiak also splattered "Protein-Rich" across its online advertising, seeking to emphasize

2   protein as its most important attribute. Reynolds Decl., Ex. 17. Nearly every advertisement

3   mentions protein, and Kodiak considers "Protein-Packed" to be

4   Reynolds Decl., Exs. 18, 19, 20; *see also id.*, Ex. 2 (Clark Depo Trans. 11:1-3, 9-10).

5        Unsurprisingly, Kodiak

6   Reynolds Decl., Ex. 1 (Smith Depo Trans. 38:2-6); Ex. 2 (Clark

7   Trans. 60:20-23).

8

9   Reynolds Decl., Ex.

10

11   Reynolds Decl., Ex. 38.

12

13   Reynolds Decl., Ex. 22, 45.

14

15

16

17   Reynolds Decl.,

18   Ex. 23.

19        Kodiak's decision to focus on protein as a selling point was a major success. Since adding

20   protein representations to its labels,

21   Reynolds Decl., Ex 2 (Clark Depo Trans

22   39:12-15).                                Reynolds Decl., Ex. 24. Kodiak

23   acknowledged                                Reynolds Decl.,

24   Exs. 25, 26.

25       **B.**    **Kodiak' Protein Claims Are Both False and Misleading: The Products**
               **Neither Contain nor Provide as Much Protein as Advertised.**

26        Unfortunately, Kodiak's success was built on a lie. Kodiak's products neither contain nor

27   provide the amount of protein they claim on the front. They do not contain as much protein as

28   claimed because

-4-

1   ███████████████████   They do not provide as much protein as claimed because Kodiak Cakes

2   uses low quality, incomplete protein sources like wheat and oats, which are of little use to the

3   human body.

4             **1.       Regulatory Framework**

5         The Federal Food, Drug, and Cosmetic Act (FDCA) is a statutory regime "designed

6   primarily to protect the health and safety of the public at large." *POM Wonderful LLC v. Coca-*

7   *Cola Co.*, 573 U.S. 102, 108 (2014). The FDCA prohibits the misbranding of food or drink.  A

8   food is misbranded if its label is "false or misleading in any particular." 21 U.S.C. § 343(a).

9         To implement the FDCA, the Food and Drug Administration (FDA) promulgated

10  regulations, including regulations that govern nutrient content claims. A nutrient content claim is

11  a claim that "expressly or implicitly characterizes the level of a nutrient." 21 C.F.R. § 101.13(b).

12  "Express" nutrient content claims include any statement, outside the Nutrition Facts Panel, about

13  the level of a nutrient. 21 C.F.R. 101.13(b)(1); 21 C.F.R. § 101.13(c). Stating information from

14  the nutrition facts panel elsewhere on the package necessarily constitutes a nutrient content claim.

15  21 C.F.R. § 101.13(c). Like labels generally, nutrient content claims in particular cannot be "false

16  or misleading in any respect." 21 C.F.R. 101.13(i)(3).

17        In addition to regulating nutrient content claims, FDA regulations require labels to include

18  a Nutrition Facts Panel (NFP), 21 C.F.R. § 101.9, and that the NFP contain a statement of the

19  number of grams of protein in a serving. 21 C.F.R. § 101.9(c)(7). The regulations permit a

20  manufacturer to compute the number of grams of protein for the NFP by relying on the nitrogen

21  method of analysis as given in the "Official Methods of Analysis of the AOAC International." *Id.*

22  The nitrogen method measures the nitrogen content of a food product and then multiplies by a

23  conversion factor to determine the amount of dietary protein. Wolfe Decl. ¶ 33. On average,

24  protein contains roughly 16% nitrogen by weight, so the typical factor is 6.25. *Id.*  However,

25  some proteins have more nitrogen than others. Wolfe Decl. ¶ 34. FDA regulations account for this

26  variability, providing that, for the NFP, "Protein content may be calculated on the basis of the

27  factor 6.25 times the nitrogen content of the food . . . *except* when official AOAC procedures

28  described in this paragraph (c)(7) require a specific factor other than 6.25, *that specific factor*

1  *shall be used.*" 21 C.F.R. § 101.9(c)(7) (emphasis added). For example, the AOAC official factor

2  for wheat protein is 5.7. *Id.*; *see also* Wolfe ¶ 34.

3      Moreover, where a product makes a protein claim, it must include a percent daily value

4  for the protein in the NFP using PDCAAS, a method that accounts for both the quantity and

5  quality of protein in the product. 21 C.F.R. 101.9(c)(7)(i)-(ii). The first step is to calculate the

6  "corrected amount of protein per serving" by multiplying protein quantity by PDCAAS, and then

7  dividing that "corrected amount" by 50 grams (the "recommended daily value" for protein) to

8  come up with a percent daily value. *Id.* The FDA promulgated this regulation because "nutrition

9  labeling must allow consumers to readily identify foods with particularly low quality protein to

10 prevent them from being misled by information on only the amount of protein present." 58 Fed.

11 Reg. 2079, at 2102.

12      While a required statement *inside* of the NFP escapes regulations reserved for nutrient

13 content claims (21 C.F.R. § 101.13(c)), the identical statement *outside* of the NFP is still

14 considered a nutrient content claim and is therefore subject to 21 C.F.R. § 101.13(i)(3). 21 C.F.R.

15 § 101.13(c). Indeed, the Ninth Circuit has specifically held that "a requirement to state certain

16 facts in the nutrition label is not a license to make that statement elsewhere on the

17 product." *Reid v. Johnson & Johnson*, 780 F.3d 952, 960 (9th Cir. 2015). Thus, Kodiak Cakes'

18 protein representations on the front label are subject to analysis as a nutrient content claim and

19 cannot be false or misleading in any manner.

20      These regulations govern all Products at issue in the case, and, in short, Kodiak violated

21 them in three ways: (1) the front label violates 21 C.F.R. § 101.13(i)(3) both since the amount of

22 protein stated on the label fails to account for how much protein the products actually provide

23 given the poor protein quality (i.e., they are misleading) and they did not use the appropriate

24 nitrogen factor for wheat (i.e., they are literally false in terms of pure quantity); (2) the amount of

25 protein stated in the NFP violates 21 C.F.R. § 101.9(c) because it used an inflated conversion

26 factor (6.25 instead of 5.7) to report grams of protein per serving, and (3) the NFP violates 21

27 C.F.R. § 101.9(c)(i)-(ii) because it does not include a percent daily value.

28

## 2.     Protein Quality Is Critical for Determining the Amount of Protein the Human Body Can Nutritionally Utilize as Protein

Protein *quantity* by itself does not tell the full story from a human nutritional standpoint. A protein's *quality* is also critical because, as explained below, humans cannot fully digest or utilize some proteins.

Proteins are chains of amino acids linked together in specific orders and amounts. Wolfe Decl. ¶ 9. There are twenty different amino acids in total, and different types of proteins have different combinations of these amino acids linked together in different amounts. *Id*. at ¶ 11. Some proteins have all twenty amino acids present in some amount, while others contain no amount of certain amino acids. *See* Wolfe Decl. ¶ 11, 29.

The human body is comprised of thousands of proteins essential to its functioning. Wolfe Decl. ¶ 9. Those proteins are also in a constant state of turnover due to the processes of synthesis and breakdown.  *Id*. at 10. Throughout the course of the day, the rate of protein synthesis must at least equal the rate of protein breakdown for adults to maintain their lean body mass. *Id*. Some of the amino acids a human body uses for protein synthesis come from protein breakdown within the body. *Id*. at 16. The rest are supplied by digesting proteins consumed in the diet and then utilizing the amino acids those protein sources provided. *Id*. at ¶¶ 17-18. All of the body's proteins are formed through the process of protein synthesis, not supplied directly through consumption. *Id*. at ¶¶ 12-14. In other words, although humans consume dietary proteins, their bodies digests those proteins, break them down into their constituent amino acids, and then use those amino acids to synthesize the human proteins necessary for life. *Id*.

Of the twenty total amino acids, humans can produce only eleven of them on their own. *Id*. at ¶ 16. Humans cannot produce, under any circumstances, nine of the amino acids required for protein synthesis. *Id*. at 17. These nine amino acids are called the indispensable, or essential amino acids ("EAAs"), and must be obtained through the diet. *Id*. at ¶¶ 17-18. Consequently, EAAs from digesting dietary protein are necessary to sustain protein synthesis at a rate equal to or exceeding the rate of breakdown. *Id*. at ¶ 18.

"[A]ssessment of protein quality is a measure of the content, proportion, and availability of essential amino acids in food protein." 56 Fed. Reg. 60366, § B. If a dietary protein is deficient

REDACTED VERSION

in just one of the nine EAAS, it is classified as low quality. Wolfe Decl. at ¶ 27. All nine EAAs are necessary for protein synthesis to take place. *Id.* at ¶ 27-28. A relative shortage of just one EAA will stop the translation of mRNA and stop protein synthesis in its tracks. *Id.* at ¶¶ 26, 28. The rest of the EAAs from that protein then degrade, resulting in the excretion of urea, ammonia, and carbon dioxide (i.e., waste). *Id.* at ¶ 26. In other words, once the body uses up the limiting essential amino acid from that protein source, the remainder of that protein becomes useless to human protein synthesis. *Id.* at ¶¶ 17, 26, 28. In fact, the remainder is of little nutritional value to the human body in any respect. *Id.* at ¶ 28. A high-quality, complete dietary protein is one that contains all of the EAAs in proportion to their relative contributions to the daily requirement for each EAA, and will have a much greater stimulatory effect on protein synthesis than a low-quality, incomplete protein that is deficient in even just one EAA. *Id.* at ¶ 29.

A protein source's digestibility also affects the amount of useable protein a person receives from consuming it. *Id.* at ¶ 30. For example, wheat protein is only 85% digestible, meaning 15% of the protein from wheat will simply pass through the body without ever being absorbed at all. *Id.* at ¶¶ 30, 43. Wheat is also a particularly low-quality protein because of a deficiency in the essential amino acid lysine. *Id.* at ¶ 43.

"Accurate methods for determining protein quality are necessary because different food protein sources are not equivalent in their ability to support growth and body protein maintenance." 56 Fed. Reg. 60366, § B. As recognized by the FDA, the Protein Digestibility Corrected Amino Acid Score ("PDCAAS") has become widely accepted as the most appropriate method by which to measure protein quality in a way that accounts for both the amino acid profile and the digestibility of the protein. Wolfe Decl. ¶ 22; 21 C.F.R. § 101.9(c)(7)(ii). In fact, Kodiak has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" than other methods. Reynolds Decl., Ex. 1 (Smith Depo Trans. 85:15-19). The PDCAAS is based on the amount of each EAA per gram of protein in relation to the dietary requirement for the corresponding amino acid, multiplied by the digestibility of the protein. Wolfe Decl. ¶ 23. The digestibility of the protein is determined by the amount of fecal nitrogen excretion compared to the amount of nitrogen in the ingested protein. *Id.*

High quality, complete proteins have conventionally been defined as having a PDCAAS of 100% or close to 100%, meaning that if an individual were to consume 0.66 gram/kg/day of that protein, all the EAA daily requirements would be met. *Id.* at ¶ 27. Whey protein has a PDCAAS of 100%. Id. at ¶ 25; Reynolds Decl., Ex. 27. But the PDCAAS of wheat is only 42%, indicating its particularly low quality. Wolfe Decl. ¶ 42; Smith Depo Trans 71:20-22. Similarly, the PDCAAS of oats is 57%, indicating low quality. Wolfe Decl. ¶ 48.

### 3. Kodiak Cakes' Products Use Low Quality Proteins like Wheat and Oats that Provide less Protein than Claimed.

For the entire class period, Kodiak Cakes' flagship protein product, Buttermilk Power Cakes Flapjack and Waffle Mix, ███████████████████ has claimed "14g Protein" on the front label. *See* Reynolds Decl. Ex. 41; Weir Decl. ¶ 49 ████████████████

████████████ Over half of the protein in the Buttermilk Power Cakes Flapjack and Waffle Mix comes from two wheat sources: whole wheat flour and wheat protein isolate. Wolfe Decl., Ex. 4.

████ Wolfe Decl., Ex. 3. This means that touting protein based on the nitrogen method overstates the amount of protein the human body can actually use by ████ The "corrected amount of protein per serving" for this product upon accounting for PDCAAS—i.e., the amount the human body can actually use as protein— ███████████ the 14 grams claimed throughout the class period.[3] Wolfe ¶¶ 34, 60-61.

--------

[2] Kodiak Products include some added whey protein, but the vast majority of the protein comes from wheat, making the products overall a low quality source of protein.

[3] The ████ protein figure accounts not only for the protein quality, but also a correct starting point for pure protein quantity. As explained more fully below, ████████████████ For the Buttermilk Flapjack and Waffle Mix, the actual protein quantity is ███████████, not 14. Once that is factored in, as well as a .56 PDCAAS score, the math to determine the actual amount of protein that the product provides is simple: ████ Wolfe ¶¶ 34, 60-61



1

2

3

4

5

6

7

8

9  Reynolds Decl., Ex. 34.  Nevertheless, none of Kodiak's products provided a %DV at any point

10  during the class period.  Reynolds Decl., Ex. 43.

11          Kodiak also knew that the PDCAAS would demonstrate

12

13  Reynolds Decl., Ex. 29.

14

15

16                                                                          Reynolds Decl., Exs. 36; Ex. 1

17  (Smith Depo Trans. 71:23-72:1); Ex. 30

18

19

20

21

22          **4.      Kodiak Overstated Protein Quantity by Using an Inflated
                      Nitrogen Factor**

23          Throughout the class period

24                                                                          Reynolds Decl., Ex. 41. FDA regulations for

25  calculating protein quantity under the nitrogen method require AOAC nitrogen testing

26  procedures. 21 C.F.R. § 101.9(c). The AOAC procedures for wheat protein specify a conversion

27  factor of 5.7 due to its higher-than-average nitrogen content, not 6.25. Reynolds Decl., Ex. 47.

28  Wheat protein is the primary protein source in the majority of Kodiak Cakes' Products, including



1  in its flapjack and waffle mixes, frozen waffles, and frozen flapjacks.[4] Reynolds Decl., Ex. 39.

2  ████████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████  Reynolds Decl.,

4  Ex. 1 (Smith Depo Trans. 42:22-23), Ex. 44 (Response to Interrogatory No. 4).

5       As noted above, using the correct 5.7 conversion factor, ████████████

6  ████████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████████

10 Wolfe Decl., Ex. 4. ████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████

12      *Id*.; Reynolds Decl., Ex. 1 (Smith Depo Trans. 42:22-23.) According to Kodiak's

13 30(b)(6) witness, ████████████████████████████████  *Id.* (Smith

14 Depo Trans. 107:20-108:13).[5]

    **C.**    **Kodiak Consistently Misrepresented Protein During the Class Period**

16      There are five general product categories at issue in this case: flapjack and waffle mixes,

17 frozen waffles and pancakes, baking mixes, oatmeal, and snacks. Each category has different

18 varieties of products typically based on flavor, which represent a total of 70 specific products at

19 issue.[6] All of the Products have maintained a protein representation on the front label during the

---

[4] *See* Reynolds Decl.¶ 11. Some flavors of the oatmeal products, graham cracker products, and protein balls do not have wheat as a protein source.

[5] Although Kodiak's overstatements of protein quantity and protein quality both stem from its use of wheat protein, the two problems are not related. Low quality proteins do not necessarily have higher than average nitrogen content, or vice versa. It is merely coincidence here that wheat protein is both very low quality, and higher than average in nitrogen content. And, to be clear, FDA regulations *do not* specify a 5.7 nitrogen conversion factor when calculating protein *quantity* to account for the poor *quality* of wheat protein, only it's unrelated, higher nitrogen content. Nevertheless, to determine the "corrected amount of protein per serving" that a product actually provides using PDCAAS to discount for poor quality, it is essential to have an accurate starting quantity, which, for wheat protein, requires a lower 5.7 nitrogen conversion factor. Kodiak ran afoul of both the quantity and quality calculations.

[6] For example, for Flapjack and Waffle Mixes there are Buttermilk, Blueberry, Classic, Cinnamon Oat, Dark Chocolate, Almond Poppy Seed, Chocolat Chip, Strawberry Chocolate Chip, Peanut

REDACTED VERSION

1   class period, ████████████████████████████████████████

2   ██████████████████████████████████ Reynolds Decl., Exs. 40 (product labels), 42

3   (Response to Interrogatory No. 4). ████████████████████████████████

4   ████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████

6   ████████████████████

7        Throughout the class period ██████████████████████████████████

8   ████████████████████████████████████████ Reynolds Decl.,

9   Ex. ████████████████████████████████████████

10  ████████████████████████████████████████

11  ████████████████████████████ *Id.* All products contain poor

12  quality, incomplete proteins of low nutritional value, such that calculating the grams of protein

13  using the PDCAAS method would result in a lower protein representation than the Product label

14  contains. Wolfe Decl. ¶¶ 46, 50, Ex. 4.

15       **D.     Kodiak' False and Misleading Representations Deceived Consumers.**

16       Plaintiffs' survey expert, Dr. Mike Dennis, is Senior Vice President of NORC (formerly

17  known as the National Opinion Research Center) where he leads the online panel research

18  business. Dennis Decl., ¶ 2. He has been responsible for hundreds of consumer surveys. *Id.*, ¶ 3.

19  Using methodologies well established in the published literature, he polled California consumers

20  who have purchased high protein breakfast products in the last 12 months, to determine how they

21  understood the protein representation on the front label of the Products. *Id.* 27. A substantial

22  majority—90.5%—understood that "14g Protein" on the front label of the Buttermilk Power

23  Cakes Flapjack and Waffle Mix meant the product would deliver 14 grams of protein to the body

24  "in a form that is useable as protein." *Id.* ¶ 59. Of those that responded that they expected the

25  product to provide less than 14g of protein, 90.8% expected the Products to provide at least 50%

26  of the protein represented on the front label. *Id.* at ¶57.

27  _____

28  Butter, Carb-conscious Buttermilk, and Gluten-Free Frontier Oat representing ten products. These
    are all "separate products" even though they are all highly similar in all respects that matter for
    purposes of this lawsuit.

1   Dr. Dennis's findings are consistent with how Kodiak intended consumers to interpret the

2   protein representation. Kodiak Cakes knew ██████████████████████████████

3   ████████████████████████████████████████████████████████████████

4   ██████████████████   Reynolds Decl., Ex. 1 (Clark Depo Trans. 62:2-21). Kodiak

5   wanted consumers to think its Products are "protein packed," as evidenced by its marketing

6   strategy that included consistently targeting audiences that seek high protein diets such as

7   athletes, ███████████████████████████████████   and including

8   protein in nearly all of its marketing communications.  Reynolds Decl., Exs. 18, 48, 49, 50.

9   Further, as described above, Kodiak ██████████████████████████████

10  ████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████

12  ██████████████████   Reynolds Decl., Ex. 1 (Smith Depo Trans: 227:4-8

13  ████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████

15  ██████████████████████████

16  **E.   Kodiak Was Able to Charge a Price Premium as a Result of its False
        and Misleading Labeling**

17  Plaintiff's survey expert, Steve Gaskin, and damages expert, Colin Weir, propose a widely

18  accepted methodology to measure and isolate the price premium that consumers paid as a direct

19  result of the overstatement of the grams of protein in the Product on the front label: conjoint

20  analysis.  Gaskin Decl. ¶ 15; Weir Decl. ¶¶ 10, 14-22. Conjoint analysis utilizes a survey where

21  respondents are presented with various choices of product attributes, prices and alternatives, and

22  asked to select their preferred product, which allows researchers to then apply statistical methods,

23  including regression analysis, to value those attributes in the market. Gaskin Decl., ¶¶ 17-27;

24  Weir Decl.,. ¶¶ 14-22. Here, Mr. Gaskin, in consultation with Mr. Weir, designed a carefully

25  controlled conjoint survey to measure the price premium solely attributable to overstating on the

26  front label a specific amount of protein in a product. Gaskin Decl., ¶ 27; Weir Decl., ¶¶ 25.

27  Based on this analysis, which is described more fully below and in Mr. Gaskin's and Mr. Weir's

28

declarations, they concluded that consumers paid, at minimum, 15.5% more for Kodiak as a result of the misrepresentation of protein on the front label. Gaskin Decl. ¶¶ 14, 64; Weir Decl., ¶ 47.

## III.   ARGUMENT

Rule 23 provides district courts with broad discretion to determine whether a class should be certified. *See Armstrong v. Davis*, 275 F.3d 849, 872, n.28 (9th Cir. 2001). Class actions are favored where, like here, there is alleged wrongdoing against a large number of persons, each of whom has suffered only a small amount of damages. *See, e.g., Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998) (class certification appropriate because litigation costs would dwarf potential recovery by class members if forced to pursue actions individually).

A class action must satisfy all four requirements in Fed. R. Civ. P. 23(a) (1) numerosity; (2) commonality (3) typicality and (4) adequacy. The class must also satisfy at least one subdivision of Fed. R. Civ. P. 23(b). Here, the Class satisfies Rule 23(b)(3) because "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy." In some cases, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-351 (2011) (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160-61 (1982)).

### A.   The Class Satisfies the Requirements of Rule 23(a).

#### 1.   The Class is Sufficiently Numerous.

Rule 23(a)(1) requires the class to be so numerous that joinder of all class members is "impracticable." Fed. R. Civ. P. 23(a)(1). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This is sufficient. *See, e.g., Pettit v. Procter & Gamble Co.*, No. 15-CV-02150-RS, 2017 WL 3310692, at *2 (N.D. Cal. Aug. 3, 2017).

#### 2.   There are Common Questions of Fact and Law.

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury' and that the class's claims depend on 'a common contention ... of such a nature

that it is capable of classwide resolution.'" *Pettit*, 2017 WL 3310692, at *2 (quoting *Wal-Mart*, 564 U.S. at 350.). Not all questions need be common to satisfy the rule. *Id.; see also Mazza v. Honda Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) ("[C]ommonality only requires a single significant question of law or fact."). In a false labeling case, such as this, "the central question is whether [the Defendants' labels] were likely to deceive a reasonable consumer." *Kumar v. Salov N. Am. Corp.*, No. 14-CV-2411-YGR, 2016 U.S. Dist. LEXIS 92374, at *11 (N.D. Cal. July 15, 2016); *see Williams v. Gerber Products Co.*, 553 F.3d 934, 938 (9th Cir. 2008) ("[T]he primary evidence in a false advertising case is the advertising itself."). The UCL, CLRA, and FAL require a plaintiff to show only "that members of the public are likely to be deceived" based on an objective standard. *Kumar*, 2016 U.S. Dist. LEXIS 92374, at *12 (citation omitted). Where there are "identical statements on the labels of the products at issue," the answer to that question will "be based on common facts." *Id.; see also Korolshteyn v. Costco Wholesale Corp.*, No. 3:15-CV-709-CAB-RBB, 2017 WL 1020391, at *5 (S.D. Cal. Mar. 16, 2017) ("By definition, class members were exposed to these labeling claims, creating a 'common core of salient facts.'"). As a result, "[c]ourts routinely find commonality in false advertising cases." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 501 (S.D. Cal. 2013) (citing *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012)).[7]

This case is no different. The "central question" is whether Kodiak's labels were misleading and therefore unlawful under 21 U.S.C. § 343 and 21 C.F.R. § 101.13.  This is necessarily a common question based on an objective standard. *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 564, 565, 575 (N.D. Cal. 2020) (discussing the objective nature of the key inquires under the UCL, CLRA, and FAL); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018) ("[B]ecause deception and materiality under the FAL, CLRA, and UCL are objective questions, they are 'ideal for class certification because they will not require the court to investigate class members' individual interaction with the [challenged] product[s].'").

---

[7] *See also, e.g.*, *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 377 (N.D. Cal. 2010); *In re POM Wonderful LLC Marketing & Sales Practices Litig.*, 2012 WL 4490860, at *1 (C.D. Cal. Sept. 28, 2012); *Pettit v.*, 2017 WL 3310692, at *2-4.

1    Moreover, common, class-wide evidence establishes that throughout the class period: (1) a

2    protein claim appeared on all relevant Product packages (Reynolds Decl., ¶ 3, Ex. 40); (2) the

3    ████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████

5    ██████████████████ (Reynolds Decl., Ex. 5 (Response to Interrogatory No. 4); Ex. 1 [Smith

6    Depo Trans., 87:11-14]), (3) reasonable consumers interpret the claim to mean that the products

7    would provide the number of advertised grams of protein in a form that is usable to the human

8    body as protein (Dennis Decl., ¶ 62 ); and (4) the Products did not provide the grams of protein as

9    advertised either in true protein content (literally false) or in a form that could be used and

10   digested by the human body (misleading). Reynolds Decl., Ex. 46; Wolfe Decl. ¶¶ 45, 50, 62.

11   *See Vasquez v. Superior Court,* 4 Cal. 3d 800, 808 (1971) (holding that, where "numerous

12   consumers are exposed to the same dubious practice by the same seller [] proof of the prevalence

13   of the practice as to one consumer would provide proof for all.").

14          It is immaterial that the specific amount of protein claimed on some products differed,

15   e.g., the Buttermilk Power Cakes product claimed 14g protein on the front label, where as the

16   Cornbread Mix claimed 10g protein on the front. Whether or not any product label was deceptive

17   is a common question because the theory of liability is the same across all products. All of the

18   Products contained a low-quality protein such as wheat or oats as a major protein source, and all

19   therefore overstate the amount of protein the products provide once accounting for that poor

20   quality.  As noted above, even if not misleading, the labels are literally false in terms of pure

21   protein quantity because Kodiak used the wrong nitrogen conversion factor. All labels are

22   therefore misleading and deceived reasonable consumers based on one, or both of these theories,

23   or they did not. Regardless, it's a common question. If the practice was misleading and deceptive,

24   the only variation in the labels is the degree to which they overstated protein (e.g., one product

25   overstated by 7 grams, whereas another overstated by only 5 grams), but that variance goes to

26   damages, not liability, and is therefore not sufficient to defeat class certification. *Vaquero v.*

27   *Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016) (citing cases and explaining

28   that damages calculations cannot defeat class certification).

### 3.   Plaintiff Is Typical of the Class.

"Typicality focuses on the class representative's claim—but not the specific facts from which the claim arose—and ensures that the interest of the class representative aligns with the interests of the class." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017). "The requirement is permissive, such that representative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Id.*

"Some degree of individuality is to be expected in all cases, but that specificity does not necessarily defeat typicality." *Hanlon*, 150 F.3d at 1020. Typicality is satisfied if the named plaintiffs' claims stem from the same practice or course of conduct that forms the basis of the class's claims and are based upon the same legal remedial theory. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010); *See also Just Film*, 847 F.3d at 1116 ("Her claim is typical of the class because it shares 'some common question of law and fact with class members' claims.'") (quoting Newberg on Class Actions § 3:31 (5th ed.)).

Plaintiff Minor's claims are typical of those of the other Class members. She, like all class members: purchased Kodiak Products that had a protein representation on the front label and did not have a %DV for protein in the Nutrition Facts Panel (Reynolds Decl., Ex. 6; Minor Decl. ¶ 2); believed that the Products would provide all of the grams of protein in a form that is usable to the human body as protein (Minor Decl., ¶ 3); and paid a price premium as a result of the misrepresentation (Gaskin Decl., ¶¶ 14, 64). Courts routinely find similar facts sufficient for typicality. *See, e.g.*, *Pettit*, 2017 WL 3310692, at *4 (finding typicality because the plaintiff purchased Freshmates under the apprehension they were appropriate for flushing down the toilet, and now alleges she is owed restitution of the price premium she paid for an ostensibly 'flushable' product because P&G's 'flushable' label was false"); *Astiana*, 291 F.R.D. at 502 (finding typicality where the named-plaintiff "suffered the same type of economic injury and seeks the same type of damages as the putative class members"). It does not matter that she did not purchase each product included in the class because the underlying facts and theory of liability with respect to each product is the same. *See Werdebaugh v. Blue Diamond Growers*, No. 12-CV-2724-LHK, 2014 U.S. Dist. LEXIS 71575, at *56 (N.D. Cal. May 23, 2014); *Astiana*, 291 F.R.D. at 502-03; *Ries*, 287 F.R.D. at 539-40; *Chavez*, 268 F.R.D. at 377-78.

### 4.   Plaintiff and Counsel Will Adequately Protect the Interests of the Class

Fed. R. Civ. P. 23(a)(4) requires that the class representative and class counsel "fairly and adequately protect the interests of the class." In the Ninth Circuit this is satisfied if (1) neither the representative plaintiffs nor their counsel "have any conflicts of interest with other class members," and (2) the representative plaintiffs and their counsel will "prosecute the action vigorously on behalf of the class." *Staton v. Boeing Co*., 327 F.3d 938, 957 (9th Cir. 2003).

Plaintiff will fairly and adequately protect the interests of the members of the Class, because it is in her best interest to prosecute the claims alleged in the Complaint to obtain full compensation due to all members for the illegal conduct of which she complains. She has no conflict, let alone an irreconcilable conflict, with other class members. Rather, she stands in the same shoes as all other members of the Class, seeks the same relief as other class members, and has a common interest in obtaining all of the relief sought.

Plaintiff's counsel will also adequately protect the interests of the class. Counsel have successfully represented numerous plaintiff classes, involving a variety of claims, in state and federal courts throughout the country. Safier Decl., ¶2, Ex. A, p. 1-5, 9-14. Gutride Safier LLP has been involved (and appointed class counsel) in at least twenty-four class actions, including several cases relating to food and product mislabeling; it also obtained many of the key Ninth Circuit precedents applicable in consumer cases. Safier Decl., Ex. A, at p. 1-5, 9-14. Plaintiff's counsel have the necessary financial resources to vigorously litigate this action. Safier Decl., ¶ 3. Neither firm has any conflicts of interest with members of the class. *See id*. This is more than sufficient to establish adequacy. *See, e.g.*, *Astiana*, 291 F.R.D. at 503 (finding adequacy where "the interim co-lead counsel has experience in prosecuting consumer fraud and warranty class actions"); *McCrary v. Elations Co., LLC*, No. EDCV 13-00242 JGB OP, 2014 WL 1779243, at *12 (C.D. Cal. Jan. 13, 2014) (finding adequacy where class counsel was "an experienced class action firm that has participated in many cases similar to the present action and has the resources and intent to vigorously prosecute this action").

### B.     The Class Satisfies the Requirements of Rule 23(b)(3)

Rule 23(b)(3) requires that "questions of law or fact common to class members

predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry asks "whether proposed classes are sufficiently cohesive to warrant adjudication by representation. The focus is on the relationship between the common and individual issues." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011) (internal quotations and citation omitted)). Predominance does not require that all issues in the case be common. Rather, the common questions need only be "a significant aspect of the case . . . [that] can be resolved for all members of the class in a single adjudication." *Mazza v*, 666 F.3d at 589. Courts routinely find predominance in false labeling cases because, as discussed above, the answer to whether the label was false or misleading to reasonable consumers, and whether it was material "will be the same for the entire class." *Korolshteyn*, 2017 WL 1020391, at *6. "These common questions are not only more significant than other questions at issue in [the] suit, they are the most significant questions in this lawsuit. Therefore, these questions predominate over any individual questions that may arise." *Id.*; *see also, e.g.*, *Mullins v. Premier Nutrition Corp.*, No. 13-CV-01271-RS, 2016 WL 1535057, at *6-7 (N.D. Cal. Apr. 15, 2016) (finding predominance in false labeling action based on common questions regarding deception, materiality, and class wide proof of restitution); *Kumar,* 2016 WL 3844334, at *7-10 (same); *Pettit*, 2017 WL 3310692, at *2-4, 5 (same); *Hadley*, 324 F.Supp.3d at 1094-1103 (same); *Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, 326 F.R.D. 592, 611-614 (N.D. Cal. 2018) (same); *Post Foods*, 334 F.R.D. at 565 (same); *Ries*, 287 F.R.D. at 536-37 (same); *In re Tobacco II Cases,* 46 Cal. 4th 298, 312 (2009) (holding that questions of materiality and the likelihood a representation will mislead a reasonable consumer predominate over individual issues). These same common issues predominate here.

### 1. Common Questions Predominate About Whether Kodiak's Front Label Protein Representations Were False or Misleading.

Plaintiff established above that the central question in this case is common, i.e., whether the Product's front label representation regarding the number of grams of protein per serving is false or misleading based on the objective "reasonable consumer" standard, and will be answered by common proof. *See supra*, §§ II.B-D. With respect to this issue, "the predominance and

-19-

REDACTED VERSION

1  commonality issues collapse." *Pettit*, 2017 WL 3310692, at \*5.

2       **2.    Common Questions Predominate on Unlawfulness**

3       The UCL's "unlawful" prong "borrows" predicate legal violations and treats them as

4  independently actionable. *Wang v. Massey Chevrolet*, 97 Cal.App.4th 856, 871 (2002).  The Class

5  alleges the labels violated FDA and state regulations in at least three ways: 1) including

6  misleading front-label protein representations that render the labels misbranded under 21 U.S.C. §

7  343, 21 C.F.R. § 101.13(i), and California law; 2) failing to use the appropriate nitrogen

8  conversion factor to calculate protein content for the nutrition facts in violation of 21 C.F.R. §

9  101.9(c); and 3) failing to include a percent daily value for protein, calculated using the PDCAAS

10 method, in violation of 21 C.F.R. § 101.9(c)(7)(i)-(ii). Kodiak Cakes' liability for such

11 misbranding is a predominating common question because "proving the . . . 'unlawful' prong[] of

12 the UCL . . . do[es] not depend upon any issues specific to individual consumers."  *Lilly v. Jamba*

13 *Juice Co.*, 308 F.R.D. 231, 242 (N.D. Cal. 2014).  Rather, "[t]he label is either illegal or it is not,"

14 and that determination will apply to all Class Members the same. *Ang v. Bimbo Bakeries USA,*

15 *Inc.*, 2014 WL 1024182, at \*8 (N.D. Cal. Mar. 13, 2014).

16      **3.    Common Questions Predominate on Restitution and Damages.**

17      Plaintiff seeks restitution under the UCL, as well as damages under the CLRA and for

18 fraud, presenting further predominant common questions.[8] Pursuant to *Comcast v. Behrend*, 133

19 S. Ct. 1426 (2013), Plaintiff must show that damages are "capable of measurement" across the

20 class and that her damages model "fits" her theory of liability. *Id.* at 1435. But Plaintiff need not

21 "actually calculate under that approach before liability is established." *Brown v. Hain Celestial*

22 _____

23 [8] Under the UCL, a court may grant restitution, *Colgan v. Leatherman Tool Group, Inc.,* 135
   Cal.App. 4th 663, 694 (2006); Cal. Bus. & Prof.Code §§ 17203, 17535, an equitable remedy

24 whose purpose is "to restore the status quo by returning to the plaintiff funds in which he or she
   has an ownership interest." *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal. 4th 1134, 1149

25 (2003); *see also Cortez v. Purolator Air Filtration Products Co.,* 23 Cal. 4th 163, 177 (2000).
   Restitution has two purposes: returning money unjustly taken from the class, and deterring the

26 defendant from engaging in future violations. *See Colgan,* 135 Cal.App. 4th at 695. If restitution
   is awarded, it must be a "quantifiable sum," and the award must be supported by substantial

27 evidence. *Id.* at 698. Under the CLRA and fraud-based claims, a consumer may recover actual
   damages, punitive damages and attorney fees. Cal. Civ. Code § 1780(a)(1),(5), (d); *id.* § 3294(a).

28 The CLRA also provides for statutory damages of $5,000 for each act of false advertising to a
   person age 65 or older. Cal. Civ. Code §§ 1761(f)-(g), 1780(a)(4).

-20-

1  *Grp., Inc.,* 2014 WL 6483216, at \*19 (N.D. Cal. Nov. 18, 2014) ; *see McCrary*, 2014 WL

2  1779243, at \*15 (certifying consumer class because plaintiff presented a viable damages model

3  and "it is not necessary to show that his method will work with certainty at this time"). Moreover,

4  variations in damages among class members is not a reason to deny certification. *See Pulaski &*

5  *Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986 (9th Cir. 2015) ("damage calculations alone

6  cannot defeat class certification") (citation omitted).

7         "It is well-established that the 'price premium attributable to' an alleged misrepresentation

8  on product labeling or packaging is a valid measure of damages in a mislabeling case under the

9  FAL, CLRA, and UCL" and therefore satisfies *Comcast*. *Hadley*, 324 F. Supp. 3d at 1104; *see*

10  *also Zeiger v. WellPet LLC*, No. 3:17-cv-04056-WHO, 2021 U.S. Dist. LEXIS 37815, at \*34

11  (N.D. Cal. Feb. 26, 2021) (same); *Guido v. L'Oreal, USA, Inc.*, 2013 WL 3353857, at \*11 (C.D.

12  Cal. July 1, 2013) (same). Here, Plaintiff's survey and economics experts, Steve Gaskin and Colin

13  Weir,[9] propose a conjoint damages model to show that everyone in the class paid a price premium

14  for Kodiak Products as a result of the protein misrepresentation. Gaskin Decl., ¶ 15; Weir Decl.,

15  ¶¶ 11-12; *see also Hadley*, 324 F. Supp. 3d at 1103-1110 (approving a Gaskin and Weir-

16  sponsored conjoint analysis to measure a labeling price premium). Conjoint analysis has been

17  used for 50 years by academic researchers, industry marketing departments, and government

18  agencies to determine the price premium attributable to particular product attributes, such as label

19  claims *Id*.  Numerous courts have also approved of conjoint analysis as a methodology to

20  determine the price attributable to specific product features such as a label claim. *See Bailey v.*

21  *Rite Aid Corp.*, No. 4:18-cv-06926 YGR, 2021 U.S. Dist. LEXIS 81654, at \*50 (N.D. Cal. Apr.

22  28, 2021) (finding conjoint by Steve Gaskin to comport with requirements of *Comcast* and

23  sufficient to show damages are capable of measurement on a class-wide basis); *Hadley*, 324 F.

24  Supp. 3d at 1103 (finding conjoint analysis sufficient); *Post Foods*, 334 F.R.D. at 575 (same); *see*

25  *also, e.g.*, *In re: Lenovo Adware Litig.*, No. 15-MD-02624-RMW, 2016 WL 6277245, at \*21

26  (N.D. Cal. Oct. 27, 2016) (same); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 944 (C.D. Cal.

27

28  _____

[9] Numerous courts have also accepted Mr. Gaskin and Mr. Weir as survey and damages experts, respectively. Gaskin Decl., ¶ 16; Weir Decl., ¶ 2 and Ex. 1 attached thereto.

2015), *aff'd sub nom. Briseno*, 844 F.3d 1121, and *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 674 F. App'x 654 (9th Cir. 2017) (approving of methodology to determine class wide damages "attributable to ConAgra's labeling of Wesson Oils as '100% Natural' through the use of a conjoint analysis survey").

Mr. Gaksin designed the conjoint survey here in consultation with Mr. Weir. Gaskin Decl., ¶ 27; Weir Decl., ¶ 25. It took into account the real-world marketplace for pancake mixes, and was based on actual, historical prices that occurred in the marketplace. Gaskin Decl. ¶ 30; Weir Decl. ¶ 36. He also used actual competitor brands (identified by Kodiak), actual claims on those competitors' labels, and actual price ranges for those competitors' products. *Id.* Following well-accepted techniques for conjoint surveys, respondents were shown a variety of buttermilk pancake mix products that varied according to the product attributes tested: Brand, nutritional information, product claims, and price. Gaskin Decl. ¶¶ 29-30. Respondents chose their preferred product based on the displayed attributes, which were presented in sets of three products. *Id.* at ¶ 51. After each choice set, respondents were asked if they would actually purchase the product they stated they preferred. *Id.* Mr. Gaskin was then able to take the preference data and feed it into a market simulator that employed Hierarchical Bayesian regression to calculate the price premium that consumers paid as a result of the protein representation on the label. *Id.* ¶¶ 21-22.

Mr. Gaskin and Mr. Weir already executed the survey and analysis for the flagship Product: Buttermilk Power Cakes Flapjack and Waffle Mix. The Conjoint analysis shows that the protein representation on the Buttermilk Flapjack and Waffle Mix commanded at minimum a 15.5% market price premium. Applying that figure to the entire class of Products results in damages of $, which resulted in class wide damages for that single product of ▮▮▮▮ Weir Decl., Table 1.[10] Although currently focused on one product category, the same survey design will be

---

[10] Even were the Court to conclude that there is no classwide method for determining the amount of monetary relief that should be repaid to the Class, it nonetheless still should certify the Class to seek injunctive relief under Rule 23(b)(2). An injunction is "the primary form of relief available under the UCL to protect consumers from unfair business practices." *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 955 (2017). Rule 23(b)(2) permits certification where the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole" and is available without the need to establish predominance. *Wal-Mart Stores, Inc.*, 564 U.S. at 362–63. Here

1  used to evaluate the price premium for all remaining Product categories. *See Bailey*, 2021 U.S.

2  Dist. LEXIS 81654, at *41, n. 14.[11]

3  ### 4.    Common Questions Predominate on Materiality

4  Questions of materiality on the CLRA and Fraud claims also predominate (materiality is

5  not an element of the UCL or FAL claims). As with deception, "[q]uestions of materiality and

6  reliance are determined based upon the reasonable consumer standard, not the subjective

7  understandings of individual plaintiffs." *Kumar*, 2016 WL 3844334, at *7; *see also Stearns*, 655

8  F.3d at 1022; *Occidental Land, Inc. v. Superior Court*, 18 Cal. 3d 355, 363 (1976) (for common-

9  law fraud class, reliance can be proven on common basis by showing that misrepresentations

10  were material). Because materiality is an objective standard common to all, and class wide

11  reliance is inferred if the misrepresentations were material, this question predominates. *Cf.*

12  *Hadley*, 324 F. Supp. 3d at 1115-16 ("because deception and materiality are objective questions,

13  they are common questions.") (citations omitted). Here, Plaintiff can establish materiality through

14  Kodiak's own common survey evidence that shows that 85% of purchasers relied on the Protein

15  Representation when purchasing the Product, *e.g.*, *Kumar*, 2016 WL 3844334, at *7 ("Materiality

16  can be shown by a third party's, or defendant's own, market research showing the importance of

17  such representations to purchasers."), and the conjoint survey. Weir Decl. ¶ 48.

---

18  Plaintiff seeks an injunction requiring the protein representation to include only the grams of
19  usable protein provided by the product.

20  Even if injunctive relief is unavailable, and even if common questions do not predominate
because of damages issues, it would be appropriate to certify the class on liability issues only
21  under Rule 23(b)(1) and (c)(4). A classwide finding of liability would greatly simplify any
individual actions that might thereafter be brought for damages, whereas without such a finding,
22  such suits would be too expensive to prosecute.  Similar liability-only classes were certified in
cases involving allegedly defectively designed washing machines, where class members might be
23  entitled to different remedies depending on whether the defect manifested in their machine. *See In
re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 722 F.3d 838, 858-59 (6th Cir.
24  2013) *cert. denied*, 13-431, 2014 WL 684065 (U.S. Feb. 24, 2014) (finding certified class "will
prevail or fail in unison" and classwide liability adjudication will be "more efficient"
25  notwithstanding differences in damages); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 798 (7th
Cir. 2013) *cert. denied*, 13-430, 2014 WL 684064 (U.S. Feb. 24, 2014) (holding *Comcast* does
26  not impact cases where a liability only class is certified); *In re High-Tech Employee Antitrust
Litig.*, 985 F. Supp. 2d 1167, 1185-86 (N.D. Cal. Oct. 24, 2013) (certifying liability-only class).

27  [11] "A plaintiff is not required to actually execute a proposed conjoint analysis to show that
damages are capable of determination on a class-wide basis with common proof. *See Hadley*, 324
28  F. Supp. 3d at 1103 (holding that proposed conjoint analysis that had not yet been executed was
sufficient to show that damages can be calculated on a class-wide basis with common proof).

Kodiak will likely argue that consumers had different motivations that led to their purchases, but this fails for several reasons. First, because the misrepresentation affected the retail price of the products, all class members paid the price premium and were economically injured regardless of their reasons for purchasing the product. *See Kumar*, 2016 WL 3844334, at *7 (noting that in a "price premium" case "materiality and reliance do not break down into individualized inquiries, but can be determined on a classwide basis."). Second, a plaintiff is not required to show that the challenged statement is the "sole or even the decisive cause" influencing class members' decisions to buy the challenged products, only that it is a substantial factor. *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 327 (2011); *see Brown*, 2014 WL 6483216, at *17 (certifying a class even though consumers "buy products all the time for more than one reason"); *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 668 (C.D. Cal. 2014) (rejecting evidence that consumers had different primary motivators for purchasing product and finding predominance). And finally, at best, any "argument about 'consumers hav[ing] a variety of reasons for purchasing [the product] is 'a merits dispute as to materiality,' and is therefore a dispute 'that can be resolved classwide,' because, as discussed at length above, materiality is a 'common question' for purposes of Rule 23(b)(3).'" *Hadley*, 324 F. Supp. 3d at 1117.

**5.    A Class Action is Superior.**

Rule 23(b)(3) enumerates four factors to consider on "superiority": "(A) the interest of members of the class in individually controlling the prosecution ... of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by ... members of the class; (C) the desirability ... of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

There is little to be gained by class members filing individual claims, because the amounts are only a few dollars per purchase. Judicial resources would be conserved by concentrating the action in a single suit. Finally, the adjudication of class claims would not be significantly more burdensome than if the matter were prosecuted individually, while the prosecution of individual remedies could establish inconsistent standards of conduct for Defendants. "[A] class action has to be unwieldy indeed before it can be pronounced an inferior alternative . . . to no litigation at

REDACTED VERSION

all." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant this Motion for Class Certification.

Dated: August 2, 2021

**GUTRIDE SAFIER LLP**

/s/*Hayley Reynolds*
Seth A. Safier, Esq.
Marie McCrary, Esq.
Hayley Reynolds, Esq.
100 Pine Street, Suite 1250
San Francisco, CA 94111
